UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RAYMOND HAWKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-02911-JMS-KMB |
| | ) | |
| SCOTT, | ) | |
| MOUSER, | ) | |
| | ) | |
| Defendants. | ) | |

**Order Denying Exhaustion Defense Following *Pavey* Hearing**

In this lawsuit under 42 U.S.C. § 1983, Plaintiff Raymond Hawkins brings Eighth Amendment claims against Defendants Lieutenant Scott and Sergeant Mouser. They contend that Mr. Hawkins's claims are barred because he failed to exhaust his available administrative remedies prior to filing this civil action. A *Pavey* hearing was held to resolve the exhaustion issue. *See Pavey v. Conley*, 528 F.3d 494 (7th Cir. 2008).

For the reasons explained in this Order, the Court finds that Defendants have not met their burden of proof by establishing that the entire grievance process was available to Mr. Hawkins and that he failed to complete that process before he filed this action. Accordingly, their exhaustion defense is **denied**, and this action shall proceed to the merits.

**I. Background**

Mr. Hawkins filed this lawsuit on November 4, 2020. Dkt. 1. He was incarcerated at New Castle at the time and remains incarcerated there. Mr. Hawkins alleges that, on November 21, 2019, Defendants violated the Eighth Amendment when they sprayed him with a chemical agent and refused to provide him a decontamination shower, a clean change of clothing, and medical attention after the incident. Dkts. 10, 49.

## II. Applicable Law

The Prison Litigation Reform Act (PLRA) provides, "No action shall be brought with respect to prison conditions under section 1983 . . . until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e; *see Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Id.* at 532 (citation omitted). The requirement to exhaust provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Woodford v. Ngo*, 548 U.S. 81, 88-89 (2006) (citation omitted).

Exhaustion of available administrative remedies "means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." *Id.* at 90. Proper use of the facility's grievance system requires a prisoner "to file complaints and appeals in the place, and at the time [as] the prison's administrative rules require." *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002); *see also Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006).

That said, a prisoner need not exhaust remedies that are unavailable to him. *Ross v. Blake*, 578 U.S. 632, 642 (2016). A defendant bears the burden of establishing that the administrative remedies upon which he or she relies were available to the plaintiff. *See Thomas v. Reese*, 787 F.3d 845, 847 (7th Cir. 2015) ("Because exhaustion is an affirmative defense, the defendants must establish that an administrative remedy was available and that [the plaintiff] failed to pursue it."). "[T]he ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained.'" *Ross,* 136 S. Ct. at 1858 (internal quotation omitted). "[A]n inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (internal

2

quotation omitted). The Seventh Circuit has held that administrative remedies are not "available" for purposes of the PLRA when prison officials screen out grievances for improper reasons and based on unpublished rules. *See Hill v. Snyder*, 817 F.3d 1037, 1040 (7th Cir. 2016) ("In any event, even if Hill could have solved the implicit riddle suggested by defendants, the prison staff improperly required that, as a condition for processing his grievance, he comply with a rule that the prison had never published before . . . . Because the prison refused to process Hill's grievance based on his deviation from an unannounced rule, no further administrative remedies were available to Hill.").

### III. *Pavey* Hearing

The *Pavey* hearing was held on March 22, 2023. Dkt. 102. Mr. Hawkins appeared in person and was ably represented by recruited counsel, Paul Petro.[1] Counsel appeared on behalf of Defendants. The parties' stipulated Exhibits 1–4 were admitted. Mr. Hawkins offered Exhibit 5, and it was admitted without objection from Defendants. Mr. Hawkins and witnesses Whitney Pentecost, Jennifer Smith, Hannah Winningham, and Shane Nelson testified.

### IV. Findings of Fact

The following facts are found to be true by the Court based on the evidence presented in the record and during the evidentiary hearing.

A.  **IDOC Grievance Process**

The Indiana Department of Correction ("IDOC") maintains only one Offender Grievance Process, which is in the record as Exhibit 1.[2] At the time of the events in this suit, the Grievance

---

[1] The Court greatly appreciates the efforts of recruited counsel in representing Mr. Hawkins.

[2] At the *Pavey* hearing and relying on a memo from an Executive Assistant at New Castle, Mr. Hawkins testified that there was another, newer policy that gave the Offender Grievance Specialist only five days (not five business days) to return or accept a grievance. *See* Ex. 4 at 11. But the memo is just that—a memo. And it is clear that the memo was issued by the GEO Group, Inc. ("GEO"), the private contractor that runs

Process had three steps: (1) a formal attempt to solve a problem or concern following unsuccessful attempts at informal resolutions; (2) a written appeal to the warden or his designee; and (3) a written appeal to the Department Grievance Manager. Ex. 1 at 3.

Under the Grievance Process, a formal grievance must be submitted on a completed State Form 45471 no later than 10 business days from the date of the incident giving rise to the complaint or concern to the Offender Grievance Specialist. *Id.* at 9. Hannah Winningham testified that she was the Offender Grievance Specialist at New Castle during the time period at issue in this lawsuit. Shane Nelson testified that he is the current Offender Grievance Specialist at New Castle. The Grievance Process defines "business day" as "Monday through Friday, excluding weekends and State holidays." *Id.* at 1.

Under the Grievance Process, upon receiving a formal grievance, the Offender Grievance Specialist must review the grievance form within five business days of receiving it and either accept it and log it, or reject it. *Id.* at 10. At that point, he or she must either: (1) return an unacceptable form; or (2) provide a receipt for an accepted form. *Id.* at 9.

If the Offender Grievance Specialist determines that the grievance form does not meet the requirements of the Grievance Process, he or she must return the grievance form within one business day with an explanation as to why the form was returned and how it may be corrected. *Id.* at 10. State Form 45475 must be used for this purpose. *Id.* Upon receipt of the return form, the inmate has five business days to revise the form and return it to the Offender Grievance Specialist. *Id.* Ms. Winningham testified that, under the Grievance Process, an inmate cannot file an appeal

---

New Castle. There is no evidence in the record suggesting that GEO had the ability to alter the time a Grievance Specialist has to act on a grievance under the IDOC's grievance policy via memo. The memo also makes clear that it is a summary and that the entire revised policy was available for review. Accordingly, the Court finds that the grievance policy in the record as Exhibit 1 is the policy that applied at the time of the events at issue in this case.

after a grievance is rejected or returned. Instead, an inmate can only appeal once the grievance has been responded to.

If the grievance is not returned or rejected, the Offender Grievance Specialist has 15 business days to investigate and respond to the grievance. *Id.* at 10-11. If the inmate receives no grievance response within 20 business days of the grievance being investigated by the Offender Grievance Specialist, he may appeal as though the grievance had been denied. *Id.* at 11.

If the grievance has been denied and the inmate is dissatisfied with the response, he may appeal by completing and submitting State Form 45473, which must be submitted to the Offender Grievance Specialist within five business days after receiving the grievance response. *Id.* at 12. The appeal is then forwarded to the warden or his designee, who has five business days to respond. *Id.* If the inmate is dissatisfied with the appeal response, he may appeal the response by checking the "Disagree" box, signing, and submitting the completed State Form 45473 to the Offender Grievance Specialist, who forwards it to the Department Offender Grievance Manager for review. *Id.*

### B. Mr. Hawkins's Grievance

**1. On November 25, 2019, Mr. Hawkins gave a grievance about the incidents at issue to law librarian Whitney Pentecost for transmission to Grievance Specialist Hannah Winningham via intra-facility mail.**

The Court credits Mr. Hawkins's testimony that he completed the grievance in the record as pages 7 through 9 of Exhibit 4 and submitted it to law librarian Whitney Pentecost for transmission to Ms. Winningham via the law library's intra-facility mail on November 25, 2019, which was four days after the incidents at issue in this lawsuit. Although Ms. Winningham testified that she had no record of receiving the grievance and Ms. Pentecost testified that she had no particular recollection of receiving the grievance from Mr. Hawkins, Mr. Hawkins's testimony is supported by law library supervisor Jennifer Smith's testimony that the law library sometimes

5

accepted grievances from inmates to place in the law library's intra-facility mail. His testimony is also supported by Ms. Smith's testimony that she recalled Mr. Hawkins telling her that he was submitting grievances, but they were not going through, so he thought that submitting them through the library would be beneficial. Further support for his testimony is found in the affidavit labeled as Exhibit C within Exhibit 4. In that affidavit, Mr. Hawkins averred that he submitted a grievance about the events at issue in this lawsuit by giving it to law library staff for transmission through intra-facility mail. Ex. 2 at 12-13. Ms. Pentecost admitted in her testimony that she notarized the affidavit on February 7, 2020. *See also id.* at 13. Although the notarization does not constitute Ms. Pentecost's agreement that Mr. Hawkins's statements were true, it does establish that, as of February 7, 2020, Mr. Hawkins was claiming to have submitted a grievance about the events in this case on November 25, 2019.

The Court acknowledges that the November 25 grievance incorrectly states that the incident in question occurred on November 23, 2019. Ex. 4 at 7-9. Defendants' counsel contended that this mistake suggests that Mr. Hawkins fabricated the grievance at the time he filed this lawsuit, but the Court declines to make that inference. First, as stated, as of February 7, 2020, Mr. Hawkins claimed to have submitted the grievance on November 25, 2019, undermining the suggestion that he later fabricated the grievance in November 2020 when he filed this lawsuit. Second, the Court credits Mr. Hawkins's testimony that he was confused about the date because he had just been sprayed with a chemical agent and was told the wrong date by prison staff.

It is undisputed that the grievance in the record as pages 7 to 9 of Exhibit 4 relates to the incidents at issue in this case. Accordingly, the Court concludes that, on November 25, 2019, Mr. Hawkins gave a grievance related to the incidents at issue in this case to Ms. Pentecost for transmission to Ms. Winningham by intra-facility mail.

### 2. New Castle staff allowed inmates to file grievances by giving them to staff for transmission to the Grievance Specialist via intra-facility mail.

Ms. Winningham and Ms. Smith testified that inmates were not supposed to submit grievances via third parties and instead were supposed to put grievances in designated boxes in the chow hall. But they also both testified that, in practice, staff members—including law library staff members—took grievances from inmates and placed them in intra-facility mail for transmission to the Grievance Specialist. In addition, the Grievance Process states that grievances must be submitted "to the Grievance Specialist," but it does not specify any particular means by which that submission must be made. Ex. 1 at 9. Accordingly, the Court concludes that—at the time of the events in this lawsuit—New Castle staff allowed inmates to submit grievances by giving them to staff members for transmission to Ms. Winningham via intra-facility mail.

### 3. The November 25 grievance complied with the Grievance Process's requirements for formal grievances.

Ms. Winningham and Mr. Nelson testified that the November 25 grievance complied with the Grievance Process's requirements for formal grievances. Ms. Winningham also testified that, if she had received the grievance, she would have accepted it and investigated the claim. Accordingly, the Court concludes that the November 25 grievance complied with the Grievance Process's requirements for formal grievances.

### C. Handling of November 25 Grievance

### 1. There was no formal system for logging or tracking grievances that are received but not accepted.

Ms. Winningham testified that, when she accepted a grievance, she logged it into OGRE, which is the IDOC's computer program for tracking accepted grievances. She also testified that there was no requirement that she log or otherwise make a record of grievances that were received

7

but then returned or rejected.[3] Nonetheless, she testified that when she returned or rejected grievances, her practice was to use a State Form 45475 to transmit the grievance back to the inmate. She also testified that, when an inmate submitted multiple grievances, she sometimes added an extra letter explaining what information she needed to accept each grievance. She testified that she kept copies of returned grievances and supporting documentation and that any such copies she made are probably in a box somewhere in a warehouse.

### 2. Any rejection of the November 25 grievance was due on or about December 4, 2019.

Mr. Hawkins submitted his grievance on November 25, 2019. The Court takes judicial notice that November 25, 2019, was a Monday and that Thursday, November 28, 2019, was Thanksgiving, a state holiday. Likewise, Saturday November 30 and Sunday December 1, 2019, were weekend days. Under the Grievance Process, Ms. Winningham had five business days to review a grievance and, if she decided to reject it, another business day to return it to the inmate. Assuming that Ms. Winningham received the grievance the same day it was submitted, if she decided to reject the November 25 grievance, the Grievance Process required her to return it to Mr. Hawkins on December 4, 2019. If she received it after November 25, the deadline would be later. Accordingly, the Court concludes that any rejection of the November 25 grievance would have been due to be transmitted to Mr. Hawkins on or about December 4, 2019.

### 3. Mr. Hawkins received the December 4 rejection letter with his November 25 grievance attached and reasonably interpreted it as a rejection of the November 25 grievance.

Mr. Hawkins testified that, on December 4, 2019, he received the document labeled as "Exhibit B-1" in Exhibit 4. The document is a letter dated December 4, 2019, and it is signed by

---

[3] Mr. Nelson testified that this policy has changed, and that staff are now required to log grievances that are received but rejected.

Ms. Winningham in which she stated, as relevant here, "4.—There is not enough information. You tell me in your writing that the officer told you verbally she did not say that. I see NO request to HSA Hord about this incident. Please write her first." Ex. 4 at 10. Mr. Hawkins testified that he believed that the quoted text referred to his November 25 grievance because the letter was accompanied by a copy of the grievance that had a "4" written at the top. *See also id.* at 7 (grievance with "4" written on it). He testified that he did not write the "4." He also testified that the December 4 letter was not accompanied by a State Form 45475, as required by the Grievance Process, which meant that he did not have any way to correct his grievance. The Court credits Mr. Hawkins's testimony on all of these points.

  The Court recognizes that some of Ms. Winningham's testimony arguably contradicts Mr. Hawkins's testimony. Ms. Winningham testified that she had no record of receiving Mr. Hawkins's November 25 grievance, based on her review of the OGRE system. Ms. Winningham testified that she had not seen the November 25 grievance before the *Pavey* hearing and that she did not "believe" that she wrote the "4" on the grievance because the "4" did not look like a "4" that she would write. She testified that she wrote the December 4 letter but that it did not refer to Mr. Hawkins's November 25 grievance. She explained that it must have referred to another grievance because Mr. Hawkins's November 25 grievance did not relate to medical issues.

  As to the grievance being discussed in the December 4 letter, Ms. Winningham testified that she would have returned it to Mr. Hawkins with a State Form 45475 and kept copies of the grievance and associated documents, which are now likely in a warehouse somewhere. But Defendants have never produced any records refuting Mr. Hawkins's claim that he received the December 4 letter with a copy of the November 25 grievance and without a State Form 45475

attached. Neither have they ever produced any records showing that the December 4 letter was actually sent to Mr. Hawkins with a copy of a grievance other than the November 25 grievance.

Recognizing that the evidence conflicts on some points, the Court credits Mr. Hawkins's version of events. At the *Pavey* hearing, it was apparent that none of Defendants' witnesses had any independent recollection of what happened to the November 25 grievance after it was submitted or what paperwork was transmitted to Mr. Hawkins with the December 4 letter, in part because—at the time of the events in this lawsuit—there was no requirement that rejected grievances be logged. Ms. Winningham testified that the December 4 letter could not have referred to the November 25 grievance because the December 4 letter talked about medical issues, and the November 25 grievance did not relate to medical issues. But that reasoning is circular and fails to account for the possibility that Ms. Winningham attached the wrong grievance to the December 4 letter, thereby creating the impression that the December 4 letter was rejecting the November 25 grievance for the reasons stated in the letter—however nonsensical those reasons seemed to be. Ms. Winningham also testified that it was her practice to include a State Form 45475 when she returned grievances, but the Court does not find that testimony persuasive in terms of establishing that she actually included a State Form 45475 when she sent the December 4 letter to Mr. Hawkins. As stated above, Defendants have never come forward with any evidence that Ms. Winningham actually included a State Form 45475 when she sent Mr. Hawkins the December 4 letter, even though Ms. Winningham testified that such documentation (assuming it ever existed) should be available in a warehouse.[4]

---

[4] At the hearing, Defendants' counsel suggested that the warehouse might be controlled by the IDOC or that the IDOC's medical-care provider might be in possession of documents related to the December 4 letter because it addressed medical grievances. Those facts are irrelevant. Defendants bear the burden of proving their exhaustion defense. They knew for months before the *Pavey* hearing that Mr. Hawkins was relying on the December 4 letter to support his claims about exhaustion. They could have attempted to obtain relevant documents from any non-parties—by subpoena, if necessary—but did not do so.

At the hearing, Defendants argued that Mr. Hawkins's version of events was unsupported. Given the lack of required recordkeeping associated with rejected grievances, it is not clear what support Mr. Hawkins could offer to support his version of events beyond his own testimony. That said, Mr. Hawkins's version of events is not entirely reliant on his own testimony. As explained, any rejection of the November 25 grievance was due to be transmitted to Mr. Hawkins on or about December 4, 2019, which is when he received the December 4 letter. This fact supports Mr. Hawkins's contention that the November 25 grievance was returned to him with the December 4 letter.

Defendants ultimately ask the Court to conclude that Mr. Hawkins is lying about the events that happened after he submitted the November 25 grievance and accuse him of "tampering" with the November 25 grievance to make it look like it was transmitted with the December 4 letter. They also accuse him of failing to produce the State Form 45475 that—according to them—should have been included when Ms. Winningham sent him the December 4 letter. If Defendants had produced documentation showing that the December 4 letter was not actually transmitted to Mr. Hawkins with a copy of the November 25 grievance or that the December 4 letter was actually transmitted with a State Form 45475, then the Court might conclude that Mr. Hawkins's testimony lacks credibility.. But they did not do so and are left only with vague testimony from Ms. Winningham about her standard practice. Given the general lack of policies and procedures for handling rejected grievances, the Court credits Mr. Hawkins's testimony about the—admittedly irregular—documentation he received on December 4, 2019, that reasonably caused him to believe that the November 25 grievance was being rejected. The Court also credits his testimony that he did not receive a State Form 45475 with the December 4 letter.

**V. Discussion and Conclusions of Law**

It is undisputed that Mr. Hawkins never filed any appeals related to the incidents at issue in this case. Thus, the case centers on whether Mr. Hawkins filed a grievance at all and, if so, whether the appellate steps of the Grievance Process were available to him. Because administrative exhaustion is an affirmative defense, Defendants bear the burden to prove that Mr. Hawkins did not file a proper grievance or, if he did, that he failed to avail himself of available appellate options. They have not met that burden.

First, for the reasons stated above, the Court credits Mr. Hawkins's testimony that he did, in fact, submit the grievance in the record as pages 7 to 9 of Exhibit 4 to Ms. Pentecost for transmission to Ms. Winningham via intra-facility mail on November 25, 2019. That time was within the time for filing a grievance about the events of November 21, 2019, and Defendants' witnesses agreed that the November 25 grievance met the requirements of the Grievance Process and should have been accepted, if received. Likewise, Ms. Winnningham agreed that giving a grievance to a staff member to submit via intra-facility mail was an acceptable way to submit a grievance. Accordingly, the Court concludes that Mr. Hawkins properly submitted a grievance and complied with the first step of the Grievance Process.

Second, Defendants have not met their burden to show that the appellate steps of the Grievance Process were available to Mr. Hawkins. As stated above, the Court credits Mr. Hawkins's testimony that he received documentation on December 4, 2019, that reasonably caused him to believe that his November 25 grievance was being rejected for improper—and apparently nonsensical—reasons, namely that he did not speak to a medical staff member before submitting his non-medical grievance. The Court also credits his testimony that he did not receive a State

Form 45475 with that documentation, leaving him with no way to fix his grievance—assuming that a fix was even possible, given the stated reasons for its rejection.

Given those factual findings, Defendants have failed to carry their burden to show that the appellate steps of the Grievance Process were available to Mr. Hawkins. In the hearing brief and at the hearing, Defendants' counsel argued that Mr. Hawkins should have appealed the rejection, but Defendants' own witnesses agreed that an inmate cannot appeal the rejection of a grievance. Defendants' counsel also argued that Mr. Hawkins should have corrected the grievance but failed to explain how Mr. Hawkins could have done so without a State Form 45475 to send back to Ms. Winningham. In short, Defendants have not shown how an inmate in Mr. Hawkins's situation could have availed himself of the appellate steps of the Grievance Process, even though they bear the burden to show that those steps were available to Mr. Hawkins. *See Thomas*, 787 F.3d at 847 ("Because exhaustion is an affirmative defense, the defendants must establish that an administrative remedy was available and that [the plaintiff] failed to pursue it.").

## VI. Conclusion

For the reasons explained above, Defendants have not met their burden of showing that Mr. Hawkins failed to exhaust any steps of the administrative remedy process that were available to him and, thus, have not carried their burden on their exhaustion defense. **The exhaustion defense is therefore denied**. This case has already proceeded through merits discovery, and Defendants did not raise any arguments about the merits of Mr. Hawkins's claims in their summary-judgment motion, so the claims against them will be resolved via settlement or trial. The Court will set this matter for trial by separate Order.

After the *Pavey* hearing, Mr. Hawkins filed a *pro se* motion asking the Court to consider additional exhibits and to terminate recruited counsel's appointment. Dkt. 103. The Court was able

to resolve the exhaustion issue without considering Mr. Hawkins's proposed exhibits. In addition, the **Magistrate Judge is requested to hold an *ex parte* telephonic hearing with Mr. Hawkins and recruited counsel to resolve Mr. Hawkins's request to terminate recruited counsel's appointment.**

IT IS SO ORDERED.

Date: 5/10/2023

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

Distribution:

RAYMOND HAWKINS
885871
NEW CASTLE - CF
NEW CASTLE CORRECTIONAL FACILITY - Inmate Mail/Parcels
1000 Van Nuys Road
NEW CASTLE, IN 47362

Adam Garth Forrest
BBFCS ATTORNEYS
aforrest@bbfcslaw.com

Joseph Thomas Lipps
BBFCS ATTORNEYS
jlipps@bbfcslaw.com

Paul Stanton Petro
Petro Law Firm
paul@petrolaw.us

Magistrate Judge Kellie M. Barr